# In the United States Court of Federal Claims

**FOR PUBLICATION**

No. 21-122L

(Filed: October 28, 2024)

|  |  |
|---|---|
| **RICHARD J. NOLAN, *et al.*,** | ) ) ) |
| *Plaintiffs,* | ) ) |
| v. | ) ) |
| **UNITED STATES**, | ) ) |
| *Defendant.* | ) ) ) |

*Nicolas J. Rotsko*, Fluet, Tysons, VA, for plaintiffs.

*Mark A. Pacella*, Trial Attorney, Natural Resources Section, Environmental and Natural Resources Division, U.S. Department of Justice, Washington, DC, for defendant. With him on the briefs was *Todd Kim*, Assistant Attorney General, and *Tara M. Lewis*, *Ashley M. Carter*, and *Sarah Ruckriegle*, Trial Attorneys, Natural Resources Section, Environmental and Natural Resources Division, U.S. Department of Justice, Washington, DC.

**OPINION AND ORDER**[1]

**BONILLA, *Judge*.**

      Landowners in Pottawattamie County, Iowa, located within the Missouri River Basin, allege the U.S. Army Corps of Engineers (Corps) intentionally and repeatedly flooded their properties between 2007 and 2019. They attribute the flooding to actions taken by the Corps in response to a 2004 shift in government priorities from promoting regional investment and property development through flood control to environmental and wildlife protection by restoring the river's natural flow. The

---

[1] This case was transferred to the undersigned for adjudication on October 3, 2022, pursuant to Rule 40.1(b) of the Rules of the United States Court of Federal Claims (RCFC). At that time, and continuing through January 5, 2024, the matter was stayed pending final resolution of an appeal to the United States Court of Appeals for the Federal Circuit in a related case, *Ideker Farms, Inc. v. United States*, 71 F.4th 964 (Fed. Cir. 2023), *reh'g en banc denied* (Nov. 29, 2023) (per curiam).

landowners seek just compensation under the Fifth Amendment to the United States Constitution for the *per se* taking of their land and related personal property damage caused by the now-permanent (recurring) flowage easement.

Pending before the Court is defendant's motion to dismiss plaintiffs' amended complaint for lack of subject matter jurisdiction or, in the alternative, for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(1) and 12(b)(6). Specifically, defendant asserts plaintiffs waited too long to file this action and, further, that plaintiffs fail to allege cognizable property interests or plead their claims with the requisite specificity. The Court finds plaintiffs failed bring this action within six years of the applicable accrual date, rendering their claims time-barred. Accordingly, defendant's motion to dismiss under RCFC 12(b)(1) is GRANTED.[2]

## BACKGROUND[3]

Until the early twentieth century, the Missouri River was free flowing, flooding adjacent and nearby lands and rendering the surrounding area economically undevelopable.[4] Beginning in the late 1920s, Congress authorized the construction of dams, dikes, and levees to contain and regulate river flow, culminating in the enactment of the Flood Control Act of 1944, 33 U.S.C. § 701 *et seq.*, and the establishment of the Pick-Sloan Missouri Basin Program (f/k/a Missouri River Basin Program). These flood control measures, implemented by the Corps, were designed to spur economic development and agricultural investment in the region by creating large swathes of arable land from the former floodplain. The legislation and program also improved river navigation and provided a consistent supply of water for irrigation and municipalities. The U.S. Department of Agriculture instituted complementary programs easing land management regulations and facilitating financing.[5] Relevant here, fish and wildlife preservation took a backseat to these initiatives. The development of the Missouri River Basin led to an expansion of over 300,000 acres of farmland and a population growth of roughly twelve million new residents.

---

[2] In dismissing this action for lack of subject matter jurisdiction, the Court does not reach defendant's alternative dispositive motion under RCFC 12(b)(6).

[3] The facts are drawn from plaintiffs' amended complaint and publicly available information. *See Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 696 (2023) ("The court is not limited to the pleadings to assure itself of its jurisdiction; it may 'inquire into jurisdictional facts' to confirm jurisdiction.") (quoting *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)).

[4] The history of the Missouri River and the government's initial flood control efforts followed by the reversion to a more natural state to benefit wildlife preservation are detailed in *Ideker Farms, Inc. v. United States*, 136 Fed. Cl. 654, 660–72 (2018). A high-level summary of the critical facts is included herein for context.

[5] *See, e.g.*, Memorandum Prepared for the Missouri Basin Inter-Agency Committee, *The Department of Agriculture and the Missouri River Basin* (Apr. 1946), *available at* https://perma.cc/BG2N-TDKW (last visited Oct. 24, 2024).

Toward the end of the century, in the face of increased pressure from environmental and wildlife conservation organizations, the pendulum began swinging back towards allowing the river to flow naturally. As reflected in a January 1992 Report to Congress by the General Accounting Office (n/k/a Government Accountability Office):

> After the enactment of the Endangered Species Act of 1973, [16 U.S.C. §§ 1531–1544,] the Corps gave priority to fish and wildlife protection for threatened and endangered species over all authorized purposes except flood control. According to the Corps, other [municipal and industrial] water supply, and private irrigation uses of water within the reservoir system are authorized only if surplus reservoir water is available.

*See* https://perma.cc/9CA7-BA8F at 13 (last visited Oct. 28, 2024). The subsequent passage of the Water Resources Development Act of 1986, 33 U.S.C. § 2201 *et seq.*, as amended, and the resulting Missouri River Fish and Wildlife Mitigation Project, prioritized restoring the habitats and ecosystems of threatened and endangered fish and wildlife over flood-control efforts. Biological opinions issued by the U.S. Fish and Wildlife Services in 2000 and 2003 further hastened the Corps' shift in priorities. *See, e.g.*, *In re Operation of the Mo. River Sys. Litig.*, 305 F. Supp. 2d 1096, 1099 (D. Minn. 2004).

Following judicial intervention through multi-district litigation, the Corps revised its 1979 Missouri River Master Water Control Manual (Master Manual) in March 2004 and launched the Missouri River Recovery Program. *See id.* As succinctly explained by the Federal Circuit: "Unlike the 1979 Master Manual that prioritized flood control over wildlife, the 2004 Master Manual eliminated prioritization." *Ideker Farms*, 71 F.4th at 973. The Missouri River has since been restored to a more natural state, resulting in increased and recurring regional flooding since 2007.

On March 5, 2014, more than one hundred landowners and farmers neighboring the Missouri River filed suit in this Court alleging that the Corps' implementation of the 2004 changes to the Master Manual "caused frequent and severe flooding on [their] farms between 2007 and 2014 that amounted to permanent, physical takings under the Fifth Amendment." *Id.* In an amended complaint filed seven months later, the number of plaintiffs grew to nearly four hundred across six states, including Iowa. Relevant here, on December 14, 2020, this Court determined that, under the stabilization doctrine, the accrual date for a permanent flowage easement asserted by the three representative plaintiffs in that related case was December 31, 2014. *Ideker Farms, Inc. v. United States*, 151 Fed. Cl. 560, 596–97 (2020). On appeal, the Federal Circuit affirmed the trial court's use of the stabilization doctrine and found that the accrual date selected in that case was not clearly erroneous. 71 F.4th at 974–78.

During the pendency of the appeal in *Ideker Farms*, two additional groups of landowners filed similar suits in this Court: *Milne v. United States*, No. 20-2079 (Fed. Cl. filed Dec. 30, 2020); and the instant case, *Nolan v. United States*, No. 21-122 (Fed. Cl. filed Dec. 31, 2020).[6] The three remaining plaintiffs in this suit—i.e., Richard J. and Elizabeth A. Nolan (Nolans), Timothy and Frances Kensinger Family Trust (Kensinger Trust), and 7 Kin Legado, LLC (7 Kin)—each own several hundred acres of farmland in Pottawattamie County, Iowa, adjacent to the Missouri River.[7] However, none of the individual plaintiffs or entity principals reside in the area. Instead, each rents their property to corn and soybean farmers. In their complaint, as amended on February 5, 2024, plaintiffs claim that the actions taken by the Corps under the 2004 and 2006 versions of the Master Manual constitute a per se taking of a permanent flowage easement across their land and that the recurring flood waters between 2007 and 2019 damaged and destroyed unspecified crops, fixtures, and personal property.

Defendant seeks to dismiss plaintiffs' complaint as untimely and, alternatively, for failing to assert a cognizable Fifth Amendment taking. Critical to deciding defendant's dispositive motion is whether the December 31, 2014 accrual date determined in *Ideker Farms* is applicable here. The short answer is no. For the reasons that follow, the Court concludes that the plaintiffs in this case knew or should have known of the Corps' contributions to the increased and recurring flooding of their land and destruction of personal property—resulting in the alleged permanent flowage easement and, thus, fixing the government's claimed liability—as of late 2013 or early 2014. Because plaintiffs waited more than six years from the accrual of their claims to file this action, their complaint is time-barred and must be dismissed.

## DISCUSSION

Subject matter jurisdiction is a threshold matter that must be decided before any other issues in a case. *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) ("The requirement that jurisdiction be established as a threshold matter . . . is

---

[6] The parties dispute the actual filing date of the *Nolan* complaint. The Clerk's Office hand-stamped the complaint "received" on Monday, January 4, 2021, and initially filed and docketed the complaint on Wednesday, January 6, 2021. ECF 1. The Clerk's Office has since changed the filing date to January 4, 2021. Appended to plaintiffs' response to defendant's motion to dismiss is an email from FedEx® reporting delivery to the Clerk's Office on Thursday, December 31, 2020, at 11:11 a.m. ECF 21-4 at 8. Adding to the confusion: delivery reportedly took place on New Year's Eve; the next day, Friday, January 1, 2021, was a federal holiday; the courthouse was closed until Monday, January 4, 2021; and the Clerk's Office was operating with an in-person skeleton crew due to the COVID-19 pandemic, further complicated by vacation schedules. For the reasons set forth herein, however, the Court need not resolve this factual issue.

[7] On January 5, 2024, plaintiffs Nolan Amalgamated, LLC and Frank J. and M. Barbara Wagner (Wagners) voluntarily dismissed their claims without prejudice. ECF 12. Plaintiff Schwertley Pioneer Trust followed suit on August 2, 2024. ECF 22.

'inflexible and without exception . . . .'" (quoting *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94–95 (1998))). When the Court's authority to entertain a cause of action is challenged or otherwise called into question under RCFC 12(b)(1), the plaintiff bears the burden to present preponderant evidence that jurisdiction is proper. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). In evaluating the jurisdictional propriety of a claim, the Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). The same does not hold true for legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").

To properly invoke this Court's jurisdictional authority to entertain a cause of action, a claim must be "filed within six years after [it] first accrues." 28 U.S.C. § 2501; *see Ideker Farms*, 71 F.4th at 974–75 ("Section 2501's six-year limitation is jurisdictional.") (citing *John R. Sand & Gravel Co. v. United States*, 457 F.3d 1345, 1355 (Fed. Cir. 2006), *aff'd*, 552 U.S. 130 (2008)). As explained by the Federal Circuit in *Ideker Farms*:

> A claim accrues "when all the events have occurred which fix the liability of the Government" and the plaintiff "was or should have been aware" that the claim existed. *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006) (quoting *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988)); *Boling v. United States*, 220 F.3d 1365, 1370 (Fed. Cir. 2000). In some cases, the events that give rise to liability may take place over extended periods of time rather than at a discrete instance. In such cases, the accrual date is determined according to the stabilization doctrine, which accounts for the difficulty of ascertaining a precise time "when the property is taken by a gradual physical process rather than a discrete action undertaken by the Government." *Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011).

71 F.4th at 975.

As in *Ideker Farms*, plaintiffs in this case contend that their land has been subjected to increased and recurring flooding and significant real and personal property damage since 2007, attributable in whole or in part to the actions taken by the Corps starting in 2004. Applying the teachings of *Ideker Farms*, this Court must employ the stabilization doctrine to determine when "the consequences of [the] inundation ha[d] so manifested themselves that a final account may be struck." *See id.* (quoting *Nw. La. Fish & Game Pres. Comm'n v. United States*, 446 F.3d 1285, 1290-91 (Fed. Cir. 2006)) (first citing *Cooper v. United States*, 827 F.2d 762, 764

5

(Fed. Cir. 1987); and then citing *United States v. Dickinson*, 331 U.S. 745, 749 (1947)); *see also Boling*, 220 F.3d at 1372 ("[T]he touchstone for any stabilization analysis is determining when the environmental damage has made such substantial inroads into the property that the permanent nature of the taking is evident and the extent of the damage is foreseeable."). Stated differently, plaintiffs' Fifth Amendment claims accrued in this case—and the six-year statute of limitations began to run—when it became clear to an objective observer that increasing floodwaters encroaching upon plaintiffs' land due to the actions of the government were of such a degree and recurrence that any perceived temporary or intermittent trespass morphed into a permanent flowage easement.

Plaintiffs principally argue for the uniform application of the accrual date adopted by this Court in *Ideker Farms* (i.e., December 31, 2014). While superficially appealing, the proffer does not withstand critical analysis. As an initial matter, nonmutual offensive collateral estoppel cannot be applied against the United States to require adoption of the cited accrual date. *United States v. Mendoza*, 464 U.S. 154, 162 (1984), *quoted in Wolfe v. McDonough*, 28 F.4th 1348, 1358 n.6 (Fed. Cir. 2022). The situation presented here exemplifies why.

In *Ideker Farms*, the parties presented this Court and, consequently, the Federal Circuit a binary choice in identifying a necessarily arbitrary accrual date: "late 2007," advanced by the government, coinciding with the "first atypical flood" to conspicuously impact the three representative plaintiffs' properties; or "the end of 2014" (i.e., December 31, 2014), to align with "the court's original 'cut-off' date for plaintiffs' flooding claims" as advocated by the three representative plaintiffs. *See* 151 Fed. Cl. at 594–97; *accord* 71 F.4th at 975–78. Employing the stabilization doctrine to "the unique facts and circumstances of [that] case," this Court rejected the "first flood" argument and, instead, adopted the later date citing three factors–none of which are persuasive here. 151 Fed. Cl. at 594–97.

The Court first noted how the Corps' continuing implementation of the 2004 Master Manual and related construction activities extended through 2014 and beyond. *Id.* at 596 & n.24. On balance, the Court concluded that the ongoing construction undermined the proposed late 2007 accrual date and supported the alternative December 31, 2014 accrual date. *Id.* at 596. Embracing the dichotomy before it, the Court in *Ideker Farms* did not, however, explain why an accrual date within this seven-year span is not more accurate. In this case, plaintiffs allege "unprecedented flooding events" and "extreme flooding" on their properties in 2007, 2008, 2010, 2011, 2013, 2014, 2017, and 2019. *See, e.g.*, Am. Compl. ¶¶ 19–22, 96, 98–99. Plaintiffs attribute the "atypical flooding" of their land to the Corps' policy shift from "flood control" to "flood risk reduction" as memorialized and implemented under the 2004 and 2006 versions of the Master Manual. *Id.* ¶¶ 7, 83–85, 92, 94–100, 105–07, 109, 129–30, 132, 143. Critical here, plaintiffs characterize the floods between 2007 and 2011 as "unprecedented" and "progressively worsen[ing] in size, severity, and duration." *Id.* ¶ 98. As described in the amended complaint, moreover,

6

2011 in particular brought "extreme flooding" and "extensive losses" "on a scale never before seen." *Id.* ¶ 99. Following the "severe drought" reported for 2012, the alleged flooding in 2013 bears no specific description; post-2013, floods apparently have become less frequent and are singularly described as "remain[ing] severe."[8] *Id.* ¶¶ 95, 100. Such allegations support an accrual date between the end of 2011 and early 2014. By this time, notwithstanding any continuing flood control adjustments, the events ostensibly fixing the government's liability had occurred. *See Boling v. United States*, 220 F.3d 1365, 1370–71 (Fed. Cir. 2000) ("[S]tabilization occurs when it becomes clear that the gradual process set into motion by the government has effected a permanent taking, not when the process has ceased or when the entire extent of the damage is determined.").

The Court in *Ideker Farms* next explored when an objective observer would reasonably conclude that the near annual atypical flooding events transitioned from intermittent trespasses to a permanent taking by flowage easement. 151 Fed. Cl. at 596. Acknowledging the time continuum of potential accrual dates between "late 2007" and "the end of 2014," the Court selected the latter, stating that it was "satisfied" that the situation had stabilized as of that date. *Id.* Again, however, in light of the binary choice presented by the parties, the Court did not evaluate whether the three representative plaintiffs were reasonably placed on notice to investigate at any other point in that timespan. *See id.* Here, the cumulative effect of the repeat flooding demonstrates that the plaintiffs in this case should have been aware that a cognizable takings claim existed earlier than December 31, 2014. As pled in the amended complaint, save the severe droughts of 2009 and 2012, plaintiffs endured six years of anomalous flooding on their respective lands between 2007 and 2014, thereafter recurring in 2017 and 2019. Given the near-successive historic flooding events between 2007 and 2011, and their recurrence in 2013, this factor similarly supports an accrual date between the end of 2011 and early 2014 in this case.

Third, the Court in *Ideker Farms* weighed when the representative landowners attributed or should have attributed the increased and recurring flooding to the Corps' policy shift from flood control to wildlife preservation. *Id.* at 596–97. In doing so, the Court noted that flooding events similar to those presented in this case caused the representative plaintiffs in *Ideker Farms* to investigate the cause as early as 2010, consult experts in late 2013, and file suit on March 5, 2014. *Id.* Nevertheless, the Court adopted the otherwise arbitrary December 31, 2014 accrual date proposed by the three representative plaintiffs in that case to coincide with "the court's original 'cut-off' date for plaintiffs' flooding claims, as the date of taking." *Id.* at 597. Thus,

---

[8] Plaintiffs' attempt to recast the post-2013 flooding as "worsening annual flooding long after 2014" in opposing defendant's motion to dismiss, *see* ECF 21 at 19, is ineffective at proving the flooding situation had not stabilized by early 2014. "It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." *Kortlander v. United States*, 107 Fed. Cl. 357, 374 (2012) (citing cases).

7

this factor refines the plausible accrual date timeframe in this case to between the end of 2013 and early 2014.

It is important to note that, on appeal, the Federal Circuit did not adopt or independently confirm the accrual date selected in *Ideker Farms*. Rather, the appellate court merely concluded that the December 31, 2014 date selected by this Court based on the record and arguments presented in that case did not constitute clear error. 71 F.4th at 977. Moreover, given the applicability of the stabilization doctrine, outlined *supra*, a more accurate claim accrual date was unnecessary to discern whether the March 5, 2014 complaint in *Ideker Farms* was timely filed. In contrast, there is nothing before this Court to justify the arbitrary extension of the applicable accrual date in this case of between late-2013 and early-2014 to December 31, 2014, or later.[9] To do so would impermissibly extend the "strict[ly]" enforced six-year statute of limitations imposed upon claims properly before the Court. *See Mildenberger v. United States*, 643 F.3d 938, 945 (Fed. Cir. 2011) (quoting 28 U.S.C. § 2501) (citing *Lehman v. Nakshian*, 453 U.S. 156, 161 (1981)).

To the extent not already made clear, the Court finds that the accrual date for plaintiffs' Fifth Amendment permanent taking by flowage easement occurred—and the six-year jurisdictional statute of limitation began to run in this case—in or before March 2014.[10] By that time, over one hundred similarly situated *Ideker Farms* plaintiffs were confronted with or otherwise discovered increasing and recurring atypical flooding events impacting and damaging their real and personal property, conducted reasonable inquiries, consulted experts, retained counsel, attributed the increasing and recurring flooding events to the Corps' publicized shift in flood control policy dating back to 2004, and filed suit. Nearly three hundred additional plaintiffs

---

[9] For the reasons stated herein, the Court rejects plaintiffs' alternative suggestion that the accrual date be deferred until 2018 when they became *actually* aware that the government had a role in the recurrent flooding of their land. As explained *supra*, the applicable standard is objective rather than subjective. *See, e.g.*, *Kinsey v. United States*, 852 F.2d 556 n.* (Fed. Cir. 1988) ("It is worth noting that a claim does not accrue unless the claimant knew *or should have known* that the claim existed." (emphasis added) (citing *Jones v. United States*, 801 F.2d 1334, 1335 (Fed. Cir. 1986)). Moreover, plaintiffs' claims of historic flooding events encroaching on and inundating their properties caused by the Corps' well-publicized reversal of historical flood control measures in the region undermine any invocation of the accrual suspension rule. *See Holmes v. United States*, 657 F.3d 1303, 1317 (Fed. Cir. 2011) ("For the accrual suspension rule to apply, the plaintiff 'must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was "inherently unknowable" at the accrual date.'") (citations omitted); *Mississippi v. United States*, 173 Fed. Cl. 91, 105 (2024) ("Accrual will not be suspended . . . 'where a claimant could have asserted a claim if it had sought advice, launched an inquiry, or otherwise taken steps to discover available information.'") (citations omitted); *see, e.g.*, Am. Compl. ¶ 122 (Corps hosted an October 25, 2011 meeting with local landowners, wherein a government official reportedly advised farmers "to move out of the floodplain and don't live there."); *see also infra* note 12 (press coverage). Plaintiffs reasonably should have known about their claims much earlier than 2018.

[10] The Court need not determine a specific date or tie claim accrual to a particular physical event. *See Ideker Farms*, 71 F.4th at 977. Regardless of the precise date of accrual within this range, plaintiffs' filing on or after December 31, 2020, falls outside the six-year statute of limitations.

8

across six states joined the lawsuit over the course of the next seven months. No less can be reasonably expected of the plaintiffs in this case.

Instead, the plaintiffs in this case waited an additional six-plus years to commence this action, and only did so after being approached by counsel in the related *Milne* case as they were preparing to file suit in late 2020. Although aware—actually or constructively—of the near-annual increased atypical flooding events reportedly impacting their properties beginning in 2007, plaintiffs neglected to undertake any steps to research or investigate the cause, let alone affirmatively consult experts or counsel. Seeking to excuse their inaction, plaintiffs explain that they do not live on or farm the land in Iowa and, in fact, reside in other states. Plaintiffs' claims of excusable neglect fail factually and legally. By plaintiffs' own admissions, each property was rented and farmed by tenants who, in turn, alerted the plaintiffs about the recurring severe flooding events.[11] Further, "'[i]t is fair to charge a property owner with knowledge of what happens on [their] land,' so long as those activities are open and notorious. . . . That principle applies regardless of how far the landowner resides from the disputed property. . . ." *Ingrum v. United States*, 560 F.3d 1311, 1317 (Fed. Cir. 2009) (citation omitted). Activity is open and notorious if it leaves evidence visible on the claimant's land, even if the root cause takes place on other property. *See George Fam. Tr. ex rel. George v. United States*, 91 Fed. Cl. 177, 196–99 (2009) (Corps flood control measures reportedly causing significant damage to plaintiff's property were open and notorious and placed plaintiff on notice to investigate even though the Corps did not operate on plaintiff's property). As in *Ingrum*, the plaintiffs in this case were obligated to investigate the reported recurring and atypical flood damage to their real and personal property long before they decided to act.

Plaintiffs' charge that the actions taken by the Corps were not open and notorious (i.e., "conducted upstream such that Plaintiffs' lands were not immediately affected"), *see* ECF 21 at 23, is belied by their pleading. In their amended complaint, plaintiffs allege the Corps undertook extensive hydrological construction projects in the region pursuant to publicly available documents like the 2004 and 2006 Master Manuals and the 2000 and 2003 biological opinions. *See* Am. Compl. ¶¶ 70–93. Plaintiffs claim these developments "deprived [them] of the use and enjoyment of [their] land . . . due to a taking by flooding in 2007, 2008, 2010, 2011, 2013, 2014, 2017, 2018, and 2019." *Id.* ¶¶ 19–22; *e.g.*, *id.* ¶¶ 101–03 (describing, along with pictures, the claimed flood damage attributed to the Corps' actions). Plaintiffs' argument is also contrary to persuasive authority in this Court. *See, e.g., George*

---

[11] *See, e.g.*, ECF 21-1 at 2–3 (R. Nolan learned of flooding from his tenant and, in 2011, "traveled from Colorado to Iowa to inspect the damages and saw the destruction [him]self"; efforts to sell the property between 2011 and 2021 were unsuccessful due to flooding; suspected the Corps was responsible for the flooding events in 2018; learned of the *Ideker Farms* lawsuit in 2018); ECF 21-2 at 2–3 (7 Kin agent advised of recurring atypical flooding on land and property damage between 2007 and 2019 from tenant; took no action until a relative was contacted by counsel in *Milne* in 2020); ECF 21-3 at 3–4 (same for Kensinger Trust trustee).

*Family Tr.*, 91 Fed. Cl. at 181–82, 196–99 (Corps' upstream actions causing significant flooding events downstream deemed open and notorious, imposing upon claimants the duty to inquire as to the cause).

At bottom, even a minimal inquiry into the cause of the historic recurring flooding events impacting their land by late 2013 or early 2014—consistent with the actions taken by the *Ideker Farm* plaintiffs—would have uncovered public documents linking the Corps' flood control policy shift to plaintiffs' claimed property damage. As cited by the government, in addition to the 2004 and 2006 versions of the Master Manual and the 2000 and 2003 biological opinions, the Corps' activities and resulting lawsuits garnered media attention and coverage.[12]  Despite their residences out of state, plaintiffs in this case could and should have discovered and availed themselves of this information through cursory online research and taken action. By waiting an additional six-plus years to file suit, their claims are statutorily time-barred and, thus, beyond the Court's jurisdictional authority to entertain at this late date.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss plaintiffs' amended complaint for lack of subject matter jurisdiction (ECF 18) is GRANTED. The Clerk of Court is directed to ENTER judgment accordingly.

It is so **ORDERED**.

Armando O. Bonilla
Judge

---

[12] *See, e.g.*, ECF 18-7 at 2–3, 18-8 at 2–4, 18-9 at 2–3, 18-10 at 2–3, 18-11 at 2, 18-12 at 2–3, 18-13 at 2–3, 18-14 at 2–6, 18-15 at 2, 18-16 at 2–3, 18-17 at 2–3, 18-18 at 2–3, 18-19 at 2, 18-20 at 2–3, 18-21 at 2–5, 18-22 at 2–5, 18-23 at 2–3, 18-24 at 2–4, 18-25 at 2–3, 18-26 at 2–3, 18-27 at 2, 18-28 at 2–3.